**STATE**

v.

**Edgar GOULET.**

**No. 2009–140–C.A.**

Supreme Court of Rhode Island.

June 16, 2011.

Christopher R. Bush, Department of Attorney General, for State.

Thomas M. Dickinson, Esq., Woonsocket, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

"He said a dog that doesn't listen is no good."[1] The defendant, Edgar Goulet, was serious when he uttered those words, because shortly after saying them on May 1, 2006, he used a .22–caliber rifle to kill his dog, Sparky. After an investigation, the State of Rhode Island charged the defendant with one count of malicious killing of an animal and one count of possession of a sawed-off shotgun. On May 12, 2008, after a four-day jury trial, Mr. Goulet was convicted on both counts. The defendant appealed, alleging numerous errors-including (1) the trial justice's failure to suppress evidence seized in the course of Fourth Amendment violations and (2) an improper denial of relief from prejudicial joinder resulting in an unfair trial. The matter came before us for oral argument

---

1. Trial testimony of Heidi Eklund.

on May 3, 2011. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Procedural History

On May 1, 2006, Heidi Eklund was doing yard work at the home that she shared with her mother. Sparky, a pit bull mix that was one of several dogs owned by defendant, her next door neighbor, wandered onto the Eklund property and began sniffing and running around the yard.[2] The defendant followed into the yard and apparently was exasperated that the animal would not come to him. After defendant made what Ms. Eklund considered to be a threat against the dog, she became concerned that he was about to harm it and said, "please don't kill him. It's not his fault." However, according to Ms. Eklund, defendant merely reiterated that "a dog that doesn't listen is no good to me." He then returned to his property.

Shortly thereafter, Ms. Eklund heard the sound of an engine starting up and then a gunshot. Alarmed, the young woman dashed into the family home. Her mother, Sari Eklund, seeing her frightened daughter, and also having heard the gunshot, immediately called 911. The subsequent response and investigation by the South Kingstown Police Department resulted in the unearthing of Sparky's corpse from a shallow grave located next to a small backhoe excavator and the discovery of an illegal, sawed-off shotgun.

Exactly one year later, on May 1, 2007, the State of Rhode Island, by way of criminal information, filed charges against defendant. Count 1 charged that defendant, "on or about the 1st day of May, 2006, at South Kingstown in the County of Washington, did maliciously shoot, wound or kill an animal, to wit, a domestic canine, in violation of § 4–1–5 of the General Laws of Rhode Island, 1956, as amended (Reenactment of 2002)."[3] Count 2 charged that defendant "did have in his possession or under his control, a sawed off shotgun, in violation of § 11–47–8(b) of the General Laws of Rhode Island, 1956, as amended (Reenactment of 2002)."[4]

Before trial, defendant filed various motions.[5] First, defendant filed a motion to

---

**2.** The record reveals that although Sparky had a somewhat checkered behavioral past, on the date in question, the dog did not bark, growl, show his teeth, or generally display any signs of aggressive behavior toward or in front of Ms. Eklund.

**3.** Titled "Malicious injury to or killing of animals," G.L.1956 § 4–1–5(a) provides:

"Every person who cuts out the tongue or otherwise dismembers any animal, maliciously, or maliciously kills or wounds any animal, or maliciously administers poison to or exposes any poisonous substance with intent that the poison shall be taken or swallowed by any animal, or who maliciously exposes poisoned meat with intent that the poisoned meat is taken or swallowed by any wild animal, shall be imprisoned not exceeding two (2) years or be fined not exceeding one thousand dollars ($1,000), and shall, in the case of any animal of another, be liable to the owner of this animal for triple damages, to be recovered by civil action. In addition, any person convicted under this section is required to serve ten (10) hours of community restitution. The community restitution penalty shall not be suspended or deferred and is mandatory."

**4.** General Laws 1956 § 11–47–8(b) proscribes:

"No person shall have in his or her possession or under his or her control any sawed-off shotgun or sawed-off rifle as defined in § 11–47–2. Any person convicted of violating this subsection shall be punished by imprisonment for up to ten (10) years, or by a fine of up to five thousand dollars ($5,000), or both."

**5.** Additional motions were heard and ruled on by the trial court during pretrial hearings. We limit our presentation and review to the motions relevant to this appeal.

dismiss count 1 on the theory that G.L. 1956 § 4–13–18 controlled, and that, as such, dismissal was proper as a matter of law.[6] Second, defendant moved to suppress any and all results of a warrantless search of his property. Third, defendant moved for the suppression of any and all results from a subsequent search of the premises conducted pursuant to a warrant, because the warrant itself was supported by evidence "obtained illegally by a prior illegal search," and therefore should have been excluded under the fruit-of-the-poisonous-tree doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The defendant later filed a motion to sever the two counts of the information under Rule 14 of the Superior Court Rules of Criminal Procedure, which says in pertinent part:

"If it appears that a defendant or the State is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

In advancing the motion to sever, defendant argued that:

"[T]he prejudice displayed in this particular case is that Defendant needs to testify because he has at the very least an affirmative defense under 4–13–18 of the General Laws of the State of Rhode Island, as to Count 1. In doing so he exposes himself to filling in the gaps of the State's case in Count 2."

The trial justice conducted hearings on the various motions over the course of several days. He ruled that (1) the motion to dismiss count 1 based on § 4–13–18 was withdrawn by defendant,[7] (2) the motion to suppress evidence that had been obtained as a result of the warrantless search was denied based on the exigent and/or emergency search and plain-view exceptions to the warrant requirement, (3) the motion to suppress evidence obtained as a result of the warrant search was denied because the court ruled that the initial warrantless search was proper, and that the evidence secured by that search served as probable cause to issue the warrant, and (4) the motion to sever was denied.[8]

---

6. Titled, "Destruction of dogs in defense of person or livestock," G.L.1956 § 4–13–18 sets forth:

"Any person may kill any dog that suddenly assaults him or her or any person of his or her family or in his or her company, while the person assaulted is out of the enclosure of the owner or keeper of that dog and any person may kill any dog found out of the enclosure of its owner or keeper, assaulting, wounding, or killing any cattle, sheep, lamb, horse, hog, or fowl, not the property of its owner."

7. At the March 10, 2008 hearing, the following colloquy passed:

"[STATE]: There was a second motion to dismiss—there was a second motion to dismiss as well.

"[DEFENDANT]: Well, again, I directed that—I withdraw. The second motion to dismiss was directed to Count 1 because I think that's a matter of proof that I maintain in that, Judge, I said that we move to dismiss because we maintain that General Laws 4–13–18 is controlling. What that is, it is a person who has a right to kill a dog that recently attacked them or someone else. And I indicated the mug shot shows that, that I think it's an improper motion and would require evidence on the part of the defendant if that's a factual decision to be made by the finder of fact."

"THE COURT: That motion is passed."

8. Review of the hearing transcripts strongly suggests that the prime reasons for denial of the motion to sever was the understanding of the trial justice that "[t]here really is no testimony or we don't know what the defendant is going to testify to if he will testify at all at trial" and that the state could make out a

A jury trial held in May 2008 resulted in the conviction of defendant on both count 1 and count 2. The defendant's oral motion for new trial was denied on July 18, 2008. On that same date, the Superior Court sentenced defendant to two years imprisonment to serve on count 1, and a concurrent sentence of ten years imprisonment, two to serve, eight years suspended with probation on count 2.[9] The trial court also imposed monetary fines, ordered that the firearms owned by defendant be forfeited, ordered that defendant complete 500 hours of community service after release from incarceration and undergo mental-health and anger-management counseling. Furthermore, because he found that Mr. Goulet was a danger to the community and a flight risk, the trial justice denied defendant's motion for bail pending appeal of the convictions. The defendant appealed.

Before this Court, defendant raised the following issues: (1) a defense predicated on § 4–13–16,[10] (2) a defense predicated on § 4–13–19,[11] (3) an argument that the

prima facie case of constructive possession of the sawed-off shotgun without defendant's testimony.

**9.** The defendant filed a notice of appeal on July 18, 2008, the same day as the sentencing hearing. Retroactive to May 12, 2008, the written documents memorializing the rulings of the sentencing hearing were entered on July 21, 2008.

**10.** Section 4–13–16 provides:

"If any dog kills, wounds, worries, or assists in killing, wounding or worrying, any sheep, lamb, cattle, horse, hog, swine, fowl, or other domestic animal belonging to or in the possession of any person, or assaults, bites, or otherwise injures any person while traveling the highway or out of the enclosure of the owner or keeper of that dog, the owner or keeper of the dog shall be liable to the person aggrieved, for all damage sustained, to be recovered in a civil action, with costs of suit. If afterwards any such damage is done by that dog, the owner or keeper of the dog shall pay to the party aggrieved double the damage, to be recovered in the manner set forth and an order shall be made by the court before whom that second recovery is made, for killing the dog. The order shall be executed by the officer charged with the execution of the order, and it shall not be necessary, in order to sustain this action, to prove that the owner or keeper of the dog knew that the dog was accustomed to causing this damage."

**11.** Section 4–13–19 sets forth:

"(a) If any person, or any member of his or her family shall be assaulted by any dog, out of the enclosure of its owner or keeper, or if any person shall have reason to believe that any dog will, out of that enclosure, do any injury to his or her person, family or property, and shall make complaint under oath, to any judge of the district court, that judge shall issue a summons to the owner or keeper of the dog, to appear before the division of the district court having jurisdiction of the case; and if, on examination, the court shall believe that the assault is proved, or that the complaint has reasonable grounds for the belief, it shall adjudge, and shall adjudge that the defendant pay costs of the proceedings and award execution of the proceedings, otherwise the costs shall be paid by the complainant; and the court shall issue written notice to the owner or keeper, and the owner or keeper shall forthwith confine or kill the dog; and if he or she neglects to kill the dog or keep the dog confined, he or she shall forfeit the sum of not less than twenty-five dollars ($25.00) nor more than one hundred dollars ($100), to be recovered for the use of the city or town, and any person may kill the dog; and if, after that notice, the dog wounds or injures any person, or shall, elsewhere than on its owner's or keeper's premises, worries, wounds or kills any neat-cattle, sheep, lamb, geese or fowl, or does any other mischief, the owner or keeper is liable to pay the person injured triple damages with costs; and in all cases of complaints under this section recognizance shall be given for costs, and the fees and costs shall be the same as in other cases of complaints before the district court.

"(b) The district court judge may, in his or her discretion, if the court determines the dog, while out of the enclosure of its

search warrant was defective because the application for the warrant was based on evidence that had been illegally seized, (4) an argument that "malice" must be directed at the owner of an animal and not to the animal itself, (5) an assertion that a dog is chattel and as such is subject to disposal as property at the absolute discretion of the owner, (6) a contention that he had a constitutional right to keep and bear arms under the Second Amendment to the United States Constitution, (7) an invocation of the antique firearm statute at G.L. 1956 § 11–47–25,[12] (8) the contention that § 4–13–18 controls the case, (9) an argument that the trial justice erred in failing to suppress evidence garnered as a result of the warrantless search of defendant's property, (10) a claim that the trial justice erred in failing to suppress evidence (specifically, the sawed-off shotgun) procured during a subsequent warrant search of the inside of defendant's home, and (11) an assertion that the trial justice erred when he denied defendant's motion to sever, resulting in a "crippling" effect on defendant's "ability to offer his defense of justification."

## Discussion

### A

### Issues Waived

■ Our review of the record reveals that defendant raised several issues before

this Court that either were not raised in the lower court proceedings or were not properly preserved for appeal. "It is an established rule in Rhode Island that this Court will not review issues that are raised for the first time on appeal." *State v. Briggs*, 934 A.2d 811, 815 (R.I.2007) (quoting *Union Station Associates v. Rossi*, 862 A.2d 185, 192 (R.I.2004)). Our "well-settled 'raise-or-waive' rule precludes us from considering at the appellate level issues not properly presented before the trial court." *State v. Merida*, 960 A.2d 228, 236 (R.I.2008); *accord State v. Gomes*, 881 A.2d 97, 113 (R.I.2005); *State v. Mohapatra*, 880 A.2d 802, 810 (R.I.2005). Moreover, under our "raise-or-waive" rule, an issue not preserved by specific objection at trial, may not be subsequently considered on appeal.[13] *State v. Pacheco*, 763 A.2d 971, 976 (R.I.2001); *see also State v. Grant*, 840 A.2d 541, 546 (R.I.2004).

■ It is clear to us that defendant failed to first raise before the Superior Court arguments pertaining to (1) § 4–13–16, (2) § 4–13–19, (3) the alleged technical defects in the warrant, (4) the common-law concept that "malice" must be directed at the owner of the animal rather than to the animal itself, (5) the common-law notion of a dog as chattel, and (6) the constitutional right to keep and bear arms under the

owner or keeper, has assaulted a person or killed a domesticated animal and is dangerous, order the detention or destruction of the dog."

**12.** Within the context of G.L.1956 chapter 47 of title 11, the "Firearms Act", § 11–47–25 says, "[t]his chapter shall not apply to antique firearms unsuitable for use, nor to collections of firearms utilized and maintained for educational, scientific, or any similar purpose without intent to use the firearms."

**13.** In *State v. Merida*, 960 A.2d 228, 236 n. 16 (R.I.2008), we observed:

"It is true that there exists a narrow exception to our 'raise-or-waive' rule. *State v. Mastracchio*, 672 A.2d 438, 446 (R.I. 1996). For that exception to apply, however, 'the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial.' *State v. Breen*, 767 A.2d 50, 57 (R.I.2001)[.]"
Here, to the extent argued, we are of the firm opinion that invocation of the narrow exception is not appropriate to the matters addressed in this portion of our opinion.

Second Amendment. We are further satisfied that there are two arguments that were raised in the proceedings below but were not preserved for appeal and therefore are waived. Those arguments are (7) the invocation of the antique firearm statute at § 11–47–25, and (8) the contention that § 4–13–18 controls the case. We therefore conclude that the only issues properly before us are the denial of the motion to sever and the Fourth Amendment claims relating to the searches of the yard and home.

## B

### The Motion to Sever

 The defendant does not contend that the state's joinder of the charge for malicious killing of an animal brought under G.L.1956 § 4–1–5 with the charge for possession of a sawed-off shotgun brought under § 11–47–8(b) was improper.[14] However, he correctly points out that even when joinder under Rule 8 of the Superior Court Rules of Criminal Procedure is proper, a defendant may nonetheless be prejudiced to such an extent that relief from joinder is appropriate under Rule 14. We have held that, "even though offenses may be appropriately joined in a single indictment, [the] defendant may move for severance of said counts for purposes of trial in the event that he is able to show such prejudice as might constitute a denial of his right to a fair trial, pursuant to Rule

14." *State v. Lassor*, 555 A.2d 339, 345 (R.I.1989); *see also State v. Sharbuno*, 120 R.I. 714, 390 A.2d 915 (1978). It is well settled that questions of severance based on Rule 14 are "within the sound discretion of the trial justice, and we will not disturb his or her decision on appeal absent the showing of a clear abuse of discretion." *State v. Fillion*, 785 A.2d 536, 541 (R.I.2001); *accord State v. Cassey*, 543 A.2d 670, 673 (R.I.1988); *State v. Ashness*, 461 A.2d 659, 668–69 (R.I.1983).

Further, we have held that "[i]t is not enough simply to show that joinder makes it more difficult to defend." *Lassor*, 555 A.2d at 346 (quoting *Johnson v. United States*, 356 F.2d 680, 682 (8th Cir.1966)); *see State v. Whitman*, 431 A.2d 1229, 1233 (R.I.1981). Rather:

> " 'To prevail in demonstrating that a trial justice has abused this discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial.' * * * The defendant must show that he did, in fact, suffer real and substantial prejudice. * * * Whether the defendant has shown that he has suffered substantial prejudice is determined by balancing 'efficiency and convenience in judicial administration on the one hand and the defendant's right to a fair trial without prejudice on the other.' " *State v. Pereira*, 973 A.2d 19, 28 (R.I.2009).

---

**14.** Rule 8(a) of the Superior Court Rules of Criminal Procedure says in part:

> "Two (2) or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan."

We observe that the state's joinder of the malicious-killing-of-an-animal charge with the possession-of-a-sawed-off-shotgun charge was not contested in the proceedings below, where defense counsel said at a March 27, 2008 hearing, "[c]learly, my brother in objecting to that motion indicated that he thought I was arguing that they were improperly joined in the first place. I don't take that position, Judge."

Here, defendant argues that "the joinder of these offenses for trial severely impeded Mr. Goulet's ability to present a defense to the shooting of [his dog]." In the motion to sever that he presented to the trial court, defendant averred, "the [d]efendant needs to testify to show that his reason for shooting the dog * * * was not for malicious purposes but for protection of the neighbors and in fear that the neighbor's two young children would be attacked by the dog." At the same time, defendant urged the trial court that he had a compelling need not to testify because by taking the stand he "may well be asked whether or not he possessed said sawed off shotgun" that was the subject of count 2, thereby "filling in the gaps" of the state's case with respect to that charge. In effect, Mr. Goulet contended that "[t]he denial of the severance motion left him in a cruel dilemma—testify and risk questioning on the unrelated [gun] charge, or decline to testify and risk rejection of his justification defense."

■ Although defendant's argument describes how trying the two counts in a single trial may have made it more difficult to defend against the charges brought by the state, it does not illuminate how he confronted "real and substantial prejudice" that can be equated to a denial of his right to a fair trial.[15] We note that defendant's brief conflates the issue of prejudicial joinder with issues that were waived—including justifications under § 4–13–18 and entitlement to dispose of personal property under the common-law theory that "a dog

is a chattel." Further, in addition to withdrawing the motion to dismiss count 1 based on the theory that § 4–13–18 controlled the case as a matter of law, we observe that defendant did not request that the jury be instructed regarding the potentially exculpatory statute that authorizes intentional killing of dogs under certain circumstances. Such considerations are relevant to our evaluation of whether defendant has shown he in fact suffered "real and substantial prejudice." *Pereira,* 973 A.2d at 28.

As we see it, defendant asserts that he was prejudiced because he was placed in the difficult position of deciding whether to testify that he was justified in killing the dog and also being questioned about the gun charge. *See Pereira,* 973 A.2d at 29 ("We see the wisdom in the rule adopted by the federal courts. Severance should not be 'mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant.' ") (quoting *United States v. Archer,* 843 F.2d 1019, 1022 (7th Cir.1988)). Even if we were to credit defendant's argument that he had helpful testimony to give relating to the reasons that he killed Sparky, he did not, in our opinion, adequately demonstrate that he could not testify about the gun charge. Indeed, his motion merely says that by doing so he "exposes himself to filling in the gaps" with respect to the shotgun charge. *See Comer v. Schriro,*

---

**15.** Real and substantial prejudice can occur in a number of recognized situations that include: (1) the defendant's being confounded in presenting separate defenses, (2) the jury's inferring criminal disposition on the part of the defendant from a finding of guilt on another charge; (3) the jury's cumulating evidence of the various crimes to find guilt on a charge that independently considered would

not support such a finding; (4) a latent hostility engendered by the charging of several crimes as opposed to only a singular charge. *State v. Pereira,* 973 A.2d 19, 28 (R.I.2009); *State v. Day,* 898 A.2d 698, 705 (R.I.2006); *State v. Goodreau,* 560 A.2d 318, 321–22 (R.I. 1989); *State v. Patriarca,* 112 R.I. 14, 30, 308 A.2d 300, 311 (1973).

480 F.3d 960, 987 (9th Cir.2007) ("[A] defendant fails to make a convincing demonstration of a strong need to refrain from testifying on particular counts when[,] [w]ithout [the defendant's] testimony, the government offered sufficient evidence to support the jury's verdict on these counts.") (quoting *United States v. Balzano,* 916 F.2d 1273, 1283 (7th Cir.1990)). Here, we agree with the state that it had sufficient evidence to carry its burden on count 2 without the testimony of defendant. The state's case on possession of an illegal sawed-off shotgun was overwhelming, considering that the illegal firearm was found under a pillow on a couch in defendant's home, and that defendant's long-term girlfriend, who lived with defendant, testified at trial that, although she owned guns, the sawed-off shotgun did not belong to her. As such, we do not agree that defendant had a strong need to refrain from testifying for the purpose of avoiding questions on the count 2 possession charge. Simply stated, the gaps that defendant claims existed in the state's case, which he contends could be filled only by his testimony, did not exist.

Our review of defendant's March 25, 2008 motion to sever and the suppression hearing conducted on March 27, 2008, lead us to the firm conclusion that defendant did not make a sufficient showing that he would be prejudiced to the extent that he would not receive a fair trial if the two counts were not severed. Therefore, we hold that the trial justice did not abuse his discretion when he denied defendant's motion.

## C

### Defendant's Fourth Amendment Claims

█ Also properly before us for review are defendant's Fourth Amendment claims. After conducting a hearing on defendant's motion to suppress evidence, the trial justice issued a detailed bench ruling on March 27, 2008, granting in part and denying in part the various suppression motions.[16] On appeal, defendant argues that it was error to deny his motions to suppress (1) evidence obtained during an initial post-arrest, warrantless search of Mr. Goulet's property, and (2) evidence that was later seized during a search conducted pursuant to a warrant.

█ This Court accords deference to a trial justice's findings of fact when it assesses a decision denying a motion to suppress evidence and refrains from overturning such findings unless they are clearly erroneous. *State v. Casas,* 900 A.2d 1120, 1129 (R.I.2006) (citing *State v. Aponte,* 800 A.2d 420, 424 (R.I.2002)); *State v. Foster,* 842 A.2d 1047, 1050 (R.I. 2004). On the other hand, "[w]hen reviewing an alleged violation of a defendant's constitutional rights, this Court 'must make an independent examination of the record to determine if [the defendant's] rights have been violated.'" *State v. Abdullah,* 730 A.2d 1074, 1076 (R.I.1999) (quoting *In re John N.,* 463 A.2d 174, 176 (R.I.1983)). In the course of this independent examination, we view the evidence in the record in the light most favorable to the state. *In re Armand,* 454 A.2d 1216, 1218 (R.I.1983) (citing *State v. Roddy,* 401 A.2d 23, 30 (R.I.1979)). Furthermore, "[w]e review a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion on a *de novo* basis." *Abdullah,* 730 A.2d at 1076 (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911

---

**16.** The hearing justice granted defendant's motion to suppress certain statements made by defendant to South Kingstown Police Department detectives while he was in custody in a police station cell block.

(1996); *State v. Rios*, 702 A.2d 889, 889–90 (R.I.1997); *State v. Campbell*, 691 A.2d 564, 569 (R.I.1997)).

At the suppression hearing, Sgt. Joyce Comstock, a twenty-three year veteran of the South Kingstown Police Department, testified that she was dispatched to the home of the defendant based on "a neighbor complaining that her neighbor was shooting at his dog." When she arrived, Sgt. Comstock saw defendant standing in his driveway. Sergeant Comstock told him that she was investigating a complaint from neighbors that "someone was shooting at a dog." Sergeant Comstock testified that defendant responded saying, "they should mind their own business." After she obtained defendant's name and date of birth, Sgt. Comstock returned to her police cruiser to check for outstanding warrants against the defendant. While she was busy with that task, Officer Kevin Andrews arrived.

In testimony found "to be credible" by the trial justice, Officer Andrews, a thirty-four year veteran of the department, testified that he arrived at defendant's home because there was "a report of a man with a firearm chasing his dog." He testified that by the time he arrived at defendant's address, he knew the identity of the 911 complainant, defendant's next-door neighbor, Sari Eklund. Officer Andrews got out of his car and approached defendant, who still was standing in the driveway. Officer Andrews testified that he told defendant that "[he] was responding to a report of a man chasing a dog in their yard with a firearm" and then asked defendant "if he shot at his dog." According to Officer Andrews, defendant said "no" before adding "that he had a lot of dogs and he had a lot of guns." Officer Andrews then asked defendant "if he killed his dog." The testimony continued:

"[STATE]: Did he respond to you?

"[OFFICER ANDREWS]: He said yes.

"[STATE]: Did you ask him another question?

"[OFFICER ANDREWS]: I asked him where is the dog now.

"\* \* \*

"[STATE]: What did he say?

"[OFFICER ANDREWS]: He said it's gone, and then he grinned at me and said you'll never find it.

"[STATE]: What did you do at that point?

"[OFFICER ANDREWS]: At that point I felt threatened because of his demeanor and that he said that he had a lot of guns and I patted him down and placed him in handcuffs."

Subsequently, Officer Andrews secured defendant in the back of his patrol car.[17] He then visited the neighbors' home and spoke with Sari Eklund and her daughter. Officer Andrews testified that he learned from those neighbors that "Mr. Goulet[ ] was chasing his dog in his yard with a firearm and said if he caught it he would kill it and that it was a dog that didn't obey, shouldn't live." He further testified that "[t]he Eklunds had told me that they had heard a gunshot and they heard Mr. Goulet's backhoe start up."

When he returned to defendant's property, Officer Andrews observed "a fresh dig excavation \* \* \*." Sergeant Comstock and Officer Andrews conducted a cursory walk of the property. During

---

**17.** The trial justice found that defendant was arrested when he was handcuffed and placed in the back of the police vehicle. He further found that prior to his "arrest," defendant was not in a situation amounting to custodial interrogation, such that Miranda warnings were required during the initial contacts between Sgt. Comstock, Officer Andrews and defendant.

that walk they found a dog collar on top of the freshly dug earth and a .22–caliber rifle in a shed. When he reviewed the admissibility of evidence harvested as a result of the officers' walk of the property, the trial justice first made a preliminary determination that the area searched was part of the curtilage of the home, and therefore was subject to the warrant requirement of the Fourth Amendment.[18]

Having so found, and after analyzing the facts, the trial justice ruled that a warrantless search of the curtilage—and the seizure of evidence found during that search—was permissible under the emergency doctrine and plain-view exceptions to the Fourth Amendment's warrant requirement. In so doing, the trial justice cited to this Court's opinion in *State v. Jennings*, 461 A.2d 361, 366 (R.I.1983), where we said:

"One of the well-recognized exceptions to the warrant requirement is the existence of exigent circumstances. In certain cases, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 301 (1978). * * * 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300 (1978) (quoting *Wayne v. United States*,

318 F.2d 205, 212 (D.C.Cir.1963)). During the course of such an 'emergency' search, police may seize any evidence that is in plain view."

The trial justice also referred to this Court's holding in *Duquette v. Godbout*, 471 A.2d 1359 (R.I.1984). In that case, we said:

"The emergency doctrine requires that the responding officer have a reasonable belief that his assistance is required to avert a crisis. *People v. Lenart*, 91 A.D.2d 132, 134, 457 N.Y.S.2d 878, 880 (1983); *State v. Sanders*, 8 Wash.App. 306, 312, 506 P.2d 892, 896 (1973). This standard is less stringent than the determination of probable cause which a police officer must make in the typical exigent-circumstances situation. Such a standard is permissible in an emergency situation since the motivation for the intrusion is to preserve life and property rather than to search for evidence to be used in a criminal investigation." *Duquette*, 471 A.2d at 1362.

In *Duquette*, we affirmed the trial court's holding that the forcible entry of police into an apartment was justified because the police had credible reason to believe that a minor might be in peril inside the apartment. *Duquette*, 471 A.2d at 1362–63. And more recently, in *State v. Portes*, 840 A.2d 1131, 1134–37 (R.I.2004), predicated on the emergency doctrine, we upheld the warrantless cursory search of an apartment where police had arrived in response to an anonymous 911 report of a disturbance that seemed to be corroborat-

---

18. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." The amendment requires that "generally the authorities must obtain a search warrant from a magistrate which must be based upon probable cause supported by an oath or affirmation. A warrantless search is per se unreasonable unless the circumstances fall within one of the few well-established and limited exceptions to the warrant requirement." *State v. Jennings*, 461 A.2d 361, 365 (R.I.1983) (citing *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).

ed because the police had seen a man attempt to leave the apartment and then retreat back inside in a suspicious manner. Furthermore, and instructive to the case at bar, in *Portes* we said:

"This Court is mindful that police are in the emergency service business and they usually have little or no time to leisurely consider their options or engage in protracted evaluation. Indeed, in this case it would have been unreasonable for the officers to simply walk away from the unanswered door given the 9–1–1 call and other facts known to them. Indeed, a 9–1–1 call is one of the most universally recognized means through which the police learn that someone is in a dangerous situation and needs immediate help." *Portes*, 840 A.2d at 1137.

Here, the trial justice found that based on information provided by the 911 call the preliminary questioning of both defendant and the neighbors, and Officer Andrew's observation of freshly dug earth when he returned from the Eklund home, the cursory search of the exterior property was both reasonable and properly limited. The trial justice found that "the police had an interest in preserving the life of the animal or anyone else who happened to be present on the premises in a relatively compact living area with houses on each side of the defendant's house." In fact, in assessing the reasonableness of the emergency search, the trial justice adjudged the circumstances suitably compelling to merit the observation that:

"In this case, the police would have * * * been derelict in their duty if they had not conducted a cursory sweep or search of the area after receiving this report of a shot being fired and after the report from the neighbors and also the information reported by the neighbors as to the defendant coming onto their property to retrieve [the dog] and basically making threats to [the dog] or about [the dog]."

Moreover, observing that the police concluded their initial sweep and applied for a search warrant at once as soon as they determined that there was no injured animal or person in need of immediate care or protection from threat of harm, the trial justice held, "it is clear that the initial search was circumscribed by the exigency that justified its initiation." That assertion is consistent with our case law, and we agree with the reasoning of the trial justice. *See Portes*, 840 A.2d at 1136 (affirming the trial justice's ruling that "the police would have been derelict in their duty" had they not entered the premises to conduct a cursory sweep).

▮ After he concluded that the search was proper, in view of the ongoing concern for the well-being of humans or animals, the trial justice then addressed defendant's contention that the .22–caliber rifle found inside the shed was out of sight, that the police could not have discovered it without disturbing the shed, and that the officers' entry into the shed constituted an impermissible expansion of the warrantless search. On that point, defendant testified at the suppression hearing that one of the officers moved a piece of plywood that covered the entrance to the shed. Conversely, Sgt. Comstock testified that the plywood was leaning against the open doorway at a pronounced angle and that the butt of the rifle was in plain view. The trial justice found Sgt. Comstock's testimony to be credible, and after he viewed photographs taken at the scene, the trial justice said, "[t]he Court does not find the defendant to be credible when he testified that essentially this rifle was out of sight * * *." We can discern no clear error in the findings of the trial justice, and our independent review of the record leads us

to conclude that defendant's Fourth Amendment claims as to the propriety of the warrantless search are without merit.

Finally, the defendant contends that the subsequent warrant search inside his home was improper because "much of the information contained in the warrant was a fruit of the initial unlawful warrantless police search of his property, and the warrant was therefore 'tainted' under the doctrine discussed in *Wong Sun v. United States,* 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963)." However, because we agree with the trial justice that the warrantless search was proper in light of the circumstances confronting the police officers, there is no poisonous tree whose fruits we must evaluate. Therefore, the evidence that was seized during the search conducted based on the warrant properly was admitted into evidence.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record is remanded to the Superior Court.